## TEXAS & N. O. R. CO. v. STEWART et al.
### No. 2983.

Court of Civil Appeals of Texas. Waco.
March 13, 1952.

Rehearing Denied April 24, 1952.

Baker, Botts, Andrews & Parish, Houston, Taylor & Dickens, Marlin, Frank A. Woods, Ben L. Parten, Franklin, for appellant.

Jones, Jones & Brian, Marshall, Grace & Palmos, Hearne, Leachman, Matthews & Gardere, Dallas, for appellees.

TIREY, Justice.

This is a suit for damages growing out of a truck collision with a passing train at a highway-railroad crossing in the city limits of Hearne in November 1949. In March 1950, Mrs. Jane Stewart, as surviving widow of Homer Charles Stewart, and as guardian of their two minor children, filed this suit against appellant for damages for his death. Plaintiffs grounded their cause of action on the negligence of the railroad company and among such grounds specifically alleged that the crossing was an unusually dangerous one at nighttime and that it was known to the defendant. Defendant denied such negligence and specially pleaded contributory negligence. The accident happened about 5:30 a. m. on November 29th, at which time it was dark and there was a heavy fog, and Stewart, the driver of the truck, drove it into the railroad train while it was crossing the highway. His parents also joined in the suit and asked for an award. The Liberty Mutual Insurance Company intervened in the suit seeking recovery of the amount it had

paid as liability insurer of Knox Glass Bottle Company on account of Stewart's death. The Knox Glass Bottle Company intervened seeking recovery for damages to the truck trailer and cargo involved in the collision.

At the conclusion of the evidence the railroad company seasonably presented its motion for peremptory instruction, which was overruled. The jury in its verdict found that the crossing was an unusually dangerous one at nighttime and that defendant at the time of the collision knew, or by the exercise of ordinary care should have known, that the crossing in question was an unusually dangerous one at nighttime and that defendant's failure to maintain an automatic warning signal at the crossing to warn of the presence of the train on the crossing was negligence, and that such negligence was the cause of the collision; that the weather conditions existing at the time of the accident coupled with the existing conditions at the crossing made it more than ordinarily hazardous; that the defendant at the time of the collision knew, or by the exercise of ordinary care should have known, that the crossing was made more than ordinarily hazardous and that the failure of the defendant to place lighted fusees or temporary flagmen at the crossing at the time was negligence, and that such negligence was a proximate cause of the collision; that Stewart discovered the presence of the train on the crossing before the collision, and that such discovery did not cause him to be in a state of panic; that upon the discovery of the train he was confronted with an emergency and that in such emergency he exercised ordinary care; that the collision was not an unavoidable accident. The jury awarded the parents $4000.00, the widow $36,000, the minor children $12,000 each. The jury found the funeral expenses necessarily incurred to be $960, and fixed the damage to the truck at $3500, and fixed the reasonable cost of repairing the truck and trailer at $1500, and fixed the cargo damage at $864. The jury further found that the truck driver did not fail to keep a proper lookout, and that he did not wholly disregard the metal warning sign on the north side of the highway as he approached the crossing; that he did not wholly disregard the foggy atmospheric condition as he approached the crossing; that he did not wholly disregard the cross arm signal post at the crossing; that as he approached the crossing he did not fail to listen for the noise of any engine or train that might be near the crossing; that he did not fail to exercise ordinary care to ascertain that the way was clear and safe before he attempted to cross the railroad track. The jury also found that at the time the truck driver applied his brakes to the truck; that he was within the corporate limits of the city of Hearne and that he was operating the truck at a greater rate of speed than thirty miles per hour, but that such action of the driver was not a proximate cause of the collision; that the truck driver at the time did not operate the truck at a greater rate of speed than was reasonable and prudent under the conditions existing, having regard to the actual and potential hazards in approaching and crossing a railway grade crossing and the then existing weather conditions; that the truck driver did not fail to have his truck under such control as it could be stopped in the range of his vision while approaching the railroad crossing and that he did not fail to have the truck under proper control as he approached it; that the Knox Glass Bottle Company did not fail to have the truck so equipped as that by application of the foot brake it was capable of being stopped when moving at twenty miles per hour when moving on a dry, smooth level road free from loose material in thirty feet and capable of being decelerated at the rate of fourteen feet per second; that the Knox Glass Bottle Company did not fail to have the brakes on the truck and tractor in good working order and adjusted so as to operate as equally as possible with respect to the wheels on opposite sides of the vehicle; that the driver did not fail to make proper use of his brakes at the time in question. The railroad company seasonably filed its motion for judgment non obstante veredicto, which was overruled, and the court, on the 23rd of October 1950, entered judgment in behalf of plaintiffs and interveners on the verdict of the jury and adjusted the rights

of the interveners and plaintiffs and no error is assigned by either plaintiffs or interveners on the awards of the court in this behalf. The railroad company seasonably filed its motion for new trial.

On December 18, 1950 the railroad company filed a plea to the jurisdiction of the court in which it set up the fact that Mrs. Jane Stewart, who sued in her own right as the surviving widow of Homer Stewart and as guardian of their two minor children, had in truth and in fact on the 3rd day of July 1950 (the trial began September 18, 1950) intermarried with James H. Stewart and failed to notify the court or anyone of such marriage and that such intermarriage constituted fundamental error and that the court should set aside the judgment. The court permitted the railroad company to file its first supplemental motion for new trial based upon such marriage and on December 21, 1950 appellee filed a stipulation admitting such marriage and thereafter on January 4, 1951 the railroad company under leave of the court's order filed its second supplemental motion for new trial based on such marriage. Thereafter the court required the following remittiturs: By Mrs. Stewart $18,000; the parents, $2000; by Glenda Ann Stewart and Sharon Kay Stewart, minors, each $2000. Appellees excepted to the order of remittitur. The court thereafter overruled appellant's amended motion for new trial and its plea to the jurisdiction of the court as well as its first and supplemental motions for new trial, to which rulings of the court the appellant excepted and prosecuted its appeal to this court. Appellees have assigned error to the court's order of remittitur.

Since the court submitted the question of liability solely upon the theory of an extra hazardous crossing, and since the defendant seasonably filed motion for instructed verdict and motion for judgment non obstante veredicto, assailing the judgment of the court to the effect that the evidence did not tender such issue, and further that the evidence tendered showed that deceased was guilty of contributory negligence as a matter of law that proximately contributed to his injuries and death, we will first give our consideration to the question of whether deceased was guilty of contributory negligence as a matter of law. A statement is necessary.

The grounds of negligence relied upon by appellees are substantially as follows: (a) that the location and grade of the highway was such that the crossing would be down grade from a crest some distance to the east and that the driver of a motor car would be upon the crossing or very close to it before it could be recognized as a railroad crossing; (b) that it was in constant use by heavy traffic; (c) that there were no lights at the crossing; (d) that there were some obstructions to the view on the margin of the track to the east, both to the north and south of the highway; (e) that all of these facts made the crossing an unusually dangerous one at nighttime; (f) that defendant had notice of the dangerous characteristics of the crossing and had been requested to erect warning signals such as blinker lights so as to warn of the approach or presence of the train at the crossing; (g) that it failed to place a flagman at the crossing and that such negligent acts were the proximate result of the injuries and death to driver Stewart; (h) that there was an extremely heavy fog about said crossing, a condition which was known to defendant to exist on the morning of the accident and to exist from time to time in such locality; (i) that visibility was greatly limited on account of the fog and that the weather conditions made the crossing of the defendant even more hazardous than the facts just alleged, and defendant negligently failed to warn the public of the occupancy of said crossing by a train through the lighting and stationing of fuses or other burning devices of like nature.

Defendant entered a general denial and in addition thereto specifically pleaded various grounds of negligence, among them being: (1) that the deceased was familiar with the railroad crossing and all the conditions then and there existing and that he negligently and unlawfully drove his motor vehicle upon the highway within the corporate limits of the city of Hearne as he approached said railroad crossing at a rate of speed in excess of thirty miles per hour, which was in violation of the statute and

the penal laws of this state and in reckless disregard of his own safety and the safety of the truck and trailer and cargo, and was guilty of negligence as a matter of law, thereby proximately causing or contributing to cause his own death and damages to the truck, trailer and cargo; (2) that deceased was familiar with the crossing and roadway and the frequency of the trains operating over the track and that he drove his truck through the fog up to the railroad track at such rate of speed that it could not be stopped in the range of his vision and violently propelled the same against the side of a freight train which was then moving across the highway, and in so doing failed to exercise ordinary care for his own safety and his truck and cargo, and that such failure proximately caused or contributed to cause the collision, and that such negligence and contributory negligence of the driver is imputed to each and all of the plaintiffs and interveners; (3) that before deceased's truck reached a point fifty feet from the railroad track the engine of said train was much nearer than 1500 feet from the crossing and was emitting loud noises and signals audible from such distance, giving warning of the immediate hazard at such crossing and that deceased was therefore negligent in failing to stop his truck before it collided with the train and that such negligence was a proximate cause or contributing cause.

Testimony was tendered to the effect that Stewart left Palestine on the morning of November 29, 1949 at 3:20 a. m., for San Antonio, Texas, his destination; that he traveled the most direct route from Palestine, going by way of Franklin and thence to Hearne, and that the distance from Palestine to Hearne was 88 miles, and that he reached the scene of the accident around 5:30 a. m.; that the deceased made his first trip over this route from Palestine to San Antonio, July 10, 1949; the second, July 27th; the third, August 10th; the fourth, September 7th; the fifth, September 10th; the sixth, November 10th; the seventh, November 22nd; and the eighth, November 25, 1949; that his return in each instance was by the same route; and that the deceased was on his ninth trip at the time he

met his death; that the truck he was driving was a White truck with trailer attached, described as a 32 foot van with tandem wheels, with Nabors trailer; that the tractor part of the truck weighed 9,800 pounds; that the van, unloaded, weighed 13,200 pounds; and that the cargo on board the truck and trailer at the time weighed 23,478 pounds, a total over all weight of 46,478 pounds.

Testimony was tendered to the effect that by survey made on the ground it was 975 feet from the crossing (east) to the crest of the hill, and that the crest of the hill is 16.64 feet higher than the crossing; that 200 feet from the crossing east, the top of the highway is 4.49 feet higher than the crossing; that 300 feet east it is 6.39 feet higher than the crossing, and at 100 feet west of the crossing the highway is 2.58 feet higher than the crossing; that the percent of the grade from the crossing east to the crest of the hill was 1.71 feet per 100 feet; that it is 84 feet from the crossing over to the center of the I. & G. N. tracks; one witness testified to the effect that approaching the crossing from the east he could see it a distance of 125 feet with lights on dim, and that you could not see a train any farther, and that with your lights on bright you could see the crossing at a distance of possibly 300 feet. Another witness testified in part: " * * * on a foggy (night) you can't see with your high lights, you got to turn your low lights on and if you have fog lights, you are all right, you can see the road, but you can't see ahead of you on a foggy night if your lights are bright."

In appellees' brief we find substantially the following summary of the testimony tendered, which is pertinent here: The main line of the appellant crossed U. S. Highway 79, at the place of collision, in the city limits of Hearne, population 7000. Trains and switch engines were frequently moved over the crossing, there being at least fourteen regularly scheduled trains moved over it in each twenty-four hour period during 1949, not counting various extra trains. Highway 79 was at such time a heavily traveled one, being the main highway between San Antonio and Shreveport,

Louisiana. Approaching the crossing from the east (as was the deceased) one would travel over a little hill and then toward the right, down a slope to a little leveled off place, then down again and then you reach the railroad track, which is lower than the road, and in such position as that upon topping the rise or ridge, the headlights would shine over the crossing. The hill seems to focus one's lights down and in coming up the hill from the east the crossing could not be seen at all, nor could a train be seen on the crossing on a clear night as one approached from the east with lights on dim at a distance within three hundred feet of the crossing, or until one was "pretty close" to the crossing when the lights were on bright. The crossing was completely dark, there being no lights there whatever to illuminate it, nor was there any warning bell at the crossing. As one approached from the east, the highway paralleled the I. & G. N. railroad tracks, came over a little hill into a low place and kind of swag in the pavement, in such way that a driver's eyes would want to follow a plane parallel to the height he was traveling, and above the railroad crossing, so as to focus on lights on a compress building and the street lights on the other side of the crossing. There were two sets of tracks at the crossing and embankments to obstruct the view. There were embankments of dirt on both the right and left hand side of the highway as the crossing was approached from the east, which obviously were formed from bar ditches that extended along by the dump, and which dump was 3½ to 4 feet higher than the ditch, or high enough to cover the wheels of boxcars or gondola cars, but not those of a locomotive. The highway approaching the crossing was of a dark or black color, and at night lights on a compress building to the west of the crossing as one approached from the east would be seen by the traveler, even above a gondola car if the same was standing on the crossing, so as to make it hard to see the car, and so as to give an illusion that the crossing was open even when it was occupied by such a car. The compress lights and street lights across the track toward Hearne from the crossing could not be seen above a boxcar, but they could be seen over a flat car or gondola car. "In August or September of 1949, before the deceased was fatally injured in November, 1949, Lucian Reed was bringing two automobiles and a tow car to Hearne, Texas moving west over Highway 79 when he approached the crossing after dark. * * * He proceeded down toward the crossing, and observed the lights across it on the compress, and thought the crossing was open, but discovered it was occupied by railroad cars so late as that he got stopped only within 15 to 25 feet of the crossing. * * There was a string of lights on the compress, and some of them would be almost directly in front of the traveler as he approached the crossing from the east. * * As Mr. Reed approached the crossing while some five gondola cars were being moved across it, in his words: 'I could see the lights over the compress, therefore I did not see these cars, in other words, it looked like the crossing was open.'" Two other witnesses testified to similar experiences. The deceased met his death before day light on the early morning of November 29, 1949, at a time when there was so dense a fog as that vision ahead of an automobile with the headlights burning was limited to from 20 feet to 100 feet; another witness said from 70 to 80 feet; another witness said 40 feet to 200 feet; another witness said 150 feet ahead of locomotive headlight; another witness said 150 feet "up side of train". The deceased operated his truck past one being driven by Fred Hairston in the flat just below the hill back east from Hearne at a speed of thirty miles per hour, after first using the customary trucker's signal of blinking his lights to get a response from Hairston that the road was clear. The deceased operated his truck properly on its side of the road on up the hill and was followed by Hairston, who was driving a feed truck, and whose first notice of the collision was a flash at the railroad crossing after he topped the hill. Hairston's truck and trailer was some 43 feet long altogether, and he observed this flash when he was two and a half truck lengths down the hill, he having seen no train going over the T. & N. O. crossing on

Highway 79 before the actual flash. "From physical facts brought out on the trial, the conclusion was justified that the truck being operated by the deceased struck the train between the south end of a gondola car and the north end of a refrigerator car, after it had been swerved to the left across the highway to the south. This was at a point 16 cars back of the engine of a 26 car train, and which train was proceeding in a northerly direction, as the deceased proceeded in a westerly direction. Bearing in mind the place of collision at the south end of the gondola car and north end of the refrigerator car toward the caboose, the next car toward the engine ahead of the gondola car was a tank car, and proceeding on toward the engine there were then two boxcars ahead of the tank car, two tank cars ahead of the boxcar, then an automobile car, next a tank car, then a boxcar, next a tank car and then two boxcars, then two refrigerator cars, then an automobile car and then a tank car. The average length of the cars was estimated as 50 feet. The speed of the train at the time of the collision was estimated at 10 to 15 miles per hour, and the speed of the truck being operated by deceased estimated to be as high as 35.5 miles per hour, as it approached the crossing. If the truck was going exactly twice as fast as the train, when it arrived within 200 feet of the crossing, the tank car was entering the crossing, to be followed by the gondola car which was struck, and as it approached the crossing the illusion of the same being open presented itself, if the compress lights were visible. * * * There was testimony that these lights were observable, at least in the form of a reflection, through the very fog existing on the night of the fatal injuries of the deceased." On the engine of the train were at least twelve fusees which could have been thrown out on the crossing and the fusees could have been seen through the fog existing from 300 to 500 feet, but a white light could not have been seen that far through the fog. Evidence was also tendered to the effect that a year and eight months before the fatal injuries to the deceased the railroad company had received specific warning of the unusually dangerous characteristics of the crossing, receipt of which was acknowledged by the superintendent; that appellant had direct notice and knowledge of the unusually dangerous characteristics of the crossing. (End of appellees' summary)

We quote from appellees' brief: "The distance that it was estimated the deceased could see ahead with his headlights under existing conditions was from 20 to 100 feet * * *. From the probable point of collision, for a distance 75 feet up the highway eastward, there were tracks from the truck, which became heavier as the same neared the railroad track * * *. The speedometer needle of the truck was jammed at a point between 17 and 18 miles per hour * * *. The force of the collision was such as to turn a refrigerator car on the freight train over and derail the train * * * and practically demolished the front part of the heavy truck * * *. The only eye witness to the collision, Fred Hairston, testified that the truck operated by deceased was traveling 'approximately 30 miles per hour' immediately before the collision. There was no direct testimony on the question of just how far the truck was from the crossing when the deceased applied his brakes."

We now return to the question presented by appellant's motion for instructed verdict and his motion for judgment non obstante veredicto, which tenders the question: Under all the evidence was deceased guilty of contributory negligence as a matter of law that proximately caused the accident? We think he was.

In Article 6701d, Vernon's Ann.Civ. Stats., we find what has been called the Uniform Act Regulating Traffic on Highways, passed by the 50th Legislature, Acts of 1947. Section 86 of that Act provides: "Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when: * * * (c) A railroad engine approaching within approximately fifteen hundred (1500) feet of the highway

crossing emits a signal audible from such distance and such engine by reason of its speed or nearness to such crossing is an immediate hazard; (d) An approaching train is plainly visible and is in hazardous proximity to such crossing." Section 143(a) of that Act provides: "It is a misdemeanor for any person to violate any of the provisions of this Act unless such violation is by this Act or other law of this State declared to be a felony."

Appellant specifically pleaded that the deceased failed to bring his truck to a stop within fifty feet of the crossing when a train was approaching and was nearer than 1500 feet from the crossing and that such failure was negligence and a proximate cause or a contributing proximate cause of the collision. The evidence is without dispute that the railroad train was occupying the crossing before the deceased reached it, the engine and fifteen other cars having passed over the crossing when deceased's truck collided with the rear end of the sixteenth car and the car behind it.

Under the undisputed evidence in this case when deceased reached the top of the hill (975 feet away from the crossing his speed was in excess of thirty miles per hour and the train's speed was from 10 to 15 miles per hour), such train was nearer than 1500 feet to the crossing; otherwise, at the rate of speed deceased was traveling he would have cleared the crossing before the train reached it. Therefore, under the undisputed evidence and under the provisions of the statute last above mentioned, deceased was guilty of negligence as a matter of law when he failed to bring his truck to a stop within fifty feet and not less than fifteen feet of the nearest rail of the railroad. Needless to say that such conduct was negligence per se and that it proximately caused the collision and resulting injuries and damages.

In Texas contributory negligence and proximate cause are questions of fact to be decided by the jury except in the following respects: (a) when they consist of violation of the law; (b) or the circumstances are such that in the opinion of the court reasonable minds could not arrive at different conclusions. See Burton v. Billingsley, Tex.Civ.App., 129 S.W.2d 439 (writ ref.) point 7, p. 442, opinion dated May 1939. See also Cross v. Wichita Falls R. Co., Tex.Civ.App., 140 S.W.2d 567; Wichita Valley R. Co. v. Fite, Tex. Civ.App., 78 S.W.2d 714; Texas-Mexican R. Co. v. Hoy, Tex.Com.App., 24 S.W.2d 18; Smith v. Henger, 148 Tex. 456, 226 S. W.2d 425, 20 A.L.R.2d 853; Texas & N. O. R. Co. v. Stratton, Tex.Civ.App., 74 S. W.2d 741 (writ ref.), opinion dated June 1934.

Bearing in mind the undisputed factual situation in this case to the effect that when deceased reached the crest of the hill he was within a distance of 975 feet from the crossing; that he was familiar with such crossing; that he was on a black top road; that it was still dark; that his visibility was greatly decreased by reason of the very heavy fog that surrounded that vicinity, and knowing that he was traveling down grade and that the truck and trailer loaded weighed 46,478 pounds, he violated the law in two respects: (1) in that he operated his truck within the city limits of Hearne at a rate of speed in excess of thirty miles per hour (See Art. 827a, sec. 8, Vernon's Ann.Penal Code); and (2) in that he failed to stop his truck within fifty feet and not less than fifteen feet of the nearest rail when an approaching train was within 1500 feet thereof (See Art. 6701d, sec. 86, Vernon's Ann.Civ. Stats.). In so doing, deceased was guilty of negligence as a matter of law. Under the foregoing conditions deceased approached the crossing charged with the duty of bringing his truck to a stop within fifty feet and not less than fifteen feet of the first rail if a moving train was within 1500 feet approaching such crossing, and knowing that if the crossing was occupied by a moving train that a collision was inevitable unless he operated his truck at such speed that he could bring it to a stop within the provisions of such statute when his lights picked up such moving train. This he wholly failed to do, and such failure convicted him of negligence as a matter of law under the provisions of Sec. 86 of Art. 6701d aforesaid.

■ It is our view that our legislature, by its enactment of sec. 86 of Art. 6701d aforesaid, says in effect that a traveler about to cross a railroad track on a highway must stop, as well as look and listen, when an approaching train is within 1500 feet of the crossing when the traveler reaches a distance within fifty feet of such crossing and not less than fifteen feet from the first rail; and if he fails to do so he is guilty of contributory negligence, barring recovery for injuries received, if he comes in contact with a moving train. This statute is in effect substantially what the law writers have called the "Pennsylvania Rule", and some of the writers have said that it is not a rule of evidence but a peremptory, absolute and unbending rule of law. See 44 Am.Jur. § 548, p. 800. See also Phillips v. Davis, 3 Cir., 3 F.2d 798, 40 A.L.R. 1241 and cases there cited. In Swoboda v. Brown, 129 Ohio St. 512, 196 N.E. 274, 278, we find this statement as to the rule when statutory provisions intervene in negligence cases: "Where a specific requirement is made by statute and an absolute duty thereby imposed, no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care. In such a situation, the obligation and requirement has been fixed and established by law, and the conduct of any person which is violative of such specific statutory requirement is illegal, and, if it proximately results in injury to one to whom a legal duty is owed, the transgressor is liable for the resulting damage." See also Claypool v. Mohawk Motor Inc., 155 Ohio St. 8, 97 N.E.2d 32. The foregoing statement is substantially the construction applied in Phillips v. Davis, supra, and the cases collated under 40 A.L.R. supra. It seems to us that our legislature, by such enactment, has fixed the standard of duty required of a traveler coming within the above provisions and that such duty is absolute and the failure to observe the same is clearly negligence per se. Our legislature has the right to fix the public policy of our state and, being interested in the preservation of the lives and general welfare of its citizens, has enacted the foregoing statute for the purpose of guarding and protecting the lives of its citizens on the highways approaching grade crossings. In so doing, in this particular instance, our legislature has provided an unbending duty on the traveler within the terms of the statute, if observed, that will eliminate crossing accidents with moving trains, and absent such observance, eliminate all claims for damages arising therefrom. Our courts are bound by our legislature's policy in this behalf.

■ Notwithstanding the foregoing view disposes of this cause, we think that appellees cannot recover for reasons hereinafter briefly discussed. It is true that the jury acquitted the deceased of negligence in every respect except operating his truck at an excessive rate of speed, but found in this respect that such excessive speed was not a proximate cause of the accident. However, since the jury convicted deceased of negligence as a matter of law in operating his truck in excess of thirty miles per hour, it is our view that under all the evidence such unlawful rate of speed was a proximate or a contributing proximate cause of his collision and that reasonable minds cannot differ in reaching such conclusion. Since deceased was familiar with the highway and railroad crossing and knew that he was approaching a crossing when he reached the peak of the hill, it was his duty to foresee an accident if his speed was such that he could not bring his truck to a stop before colliding with objects in his path within the range of the visibility available to him under the existing atmospheric conditions, and it was his duty to foresee that if a moving train was on the crossing, a collision was inevitable if his speed was such that he could not stop before colliding when his lights picked up the moving train. See Texas & N. O. R. Co. v. Stratton, supra; Wichita Valley R. Co. v. Fite, supra; also Texas & P. R. Co. v. Bigham, 90 Tex. 223, 38 S.W. 162; City of Dallas v. Maxwell, Tex.Com.App., 248 S.W. 667, 27 A.L.R. 927, points 2–3. See also McFadden v. Northern Pac. R. Co., 157 Wash. 437, 289 P. 1; Toledo Terminal R. Co. v. Hughes, 115 Ohio St. 562, 154 N.

E. 916; Bledsoe v. Missouri, K. & T. R. Co., 149 Kan. 741, 90 P.2d 9 point 4 page 14, and cases there collated; Crosby v. Great Northern R. Co., 187 Minn. 263, 245 N.W. 31 point 4 and authorities there cited; McGlauflin v. Boston & M. R. R. Co., 230 Mass. 431, 119 N.E. 955; Morley v. Cleveland, C., C. & St. L. R. Co., 100 Ind. App. 515, 194 N.E. 806; Missouri Pac. R. Co. v. Price, 182 Ark. 801, 33 S.W.2d 366. The last cases were cited with approval by our Supreme Court in Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113, point 5.

Absent the foregoing provisions of our statute just discussed, we do not think our views are in conflict with the doctrine announced in Missouri, K. & T. R. Co. v. Magee, 92 Tex. 616, 50 S.W. 1013, nor the doctrine announced by our courts in Missouri, K. & T. R. Co. v. Long, Tex.Civ. App., 293 S.W. 184; Id., Tex.Com.App., 299 S.W. 854; Id., Tex.Civ.App., 23 S.W.2d 401 (writ ref.). Each of the foregoing cases was written before the Uniform Act Regulating Traffic on Highways went into effect, which we think distinguishes the case at bar very materially from the factual situation in each of the foregoing cases, but absent the provisions of the statute we think the foregoing cases are distinguishable from the case at bar because reasonable minds cannot differ on the conclusion that deceased's excessive speed proximately caused or was a contributing proximate cause of the collision. Justice Brewster of our Supreme Court, who was the trial judge in the Long case, wrote the opinion in McMahan v. Texas & N. O. R. Co., 138 Tex. 626, 161 S.W.2d 70, and in the McMahan case he distinguished it from the Long case in that neither Long nor any of his fellow passengers had any knowledge of the proximity of any train before they collided with it, as plaintiffs did have in the McMahan case. That distinction is present here. The deceased saw the moving train on the crossing; he applied his brakes; he swerved his car to the left in an attempt to stop but was unable to do so and collided with the train with force enough to derail it. But for his speed he would have been able to bring his truck to a stop. So here we have a violation of two statutes concurring and contributing or proximately contributing to the collision, namely, excessive speed and failure to bring his truck to a stop within fifty feet and not less than fifteen feet of the first rail. Moreover, in the Long case it was Long's first trip over the highway and he was wholly unfamiliar with the surrounding circumstances, which is not the case here. Stewart was making his ninth approach to the crossing from the east and these trips had been fairly close together, all of them since July 10th of the year he met his death. He was aware of the atmospheric conditions under which he was driving, and while the record does not show that the weather was foggy at the time he left Palestine, it was at Franklin and Hairston said that the fog was heavy when deceased passed him. The case at bar is likewise distinguishable from the factual situation that existed in Gulf C. & S. F. R. Co. v. Picard, Tex.Civ.App., 147 S.W.2d 303; Beaumont, S. L. & W. R. Co. v. Richmond, Tex.Civ.App., 78 S.W.2d 232, and St. Louis, B. & M. R. Co. v. Brack, Tex.Civ.App., 102 S.W.2d 261. Our Supreme Court in Texas & N. O. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113, grounded its opinion on the fact that Compton knew of the presence of the train in the area preceding the collision. Needless to say the rule of comparative negligence in this state does not prevail. See Blakesley v. Kircher, Tex.Com.App., 41 S.W.2d 53.

Since it is our view that deceased was guilty of contributory negligence as a matter of law under the provisions of Sec. 86, of Art. 6701d, aforesaid, and that such negligent act proximately caused his collision and injuries, all other questions presented pass out of this case. Needless to say, this case, which involves so much tragedy, has given the court great concern. Nevertheless it is our duty to follow the law and apply it to the factual situation as accurately as our ability will permit, and this we believe we have done. Believing that this cause has been fully developed, it

would serve no useful purpose to reverse and remand this cause and for that reason the judgment of the trial court is reversed and rendered in favor of appellant.

LESTER, C. J., took no part in the consideration and disposition of this case.