LARSON v. MISSOURI–KANSAS–TEXAS R. CO. OF TEXAS.

No. 10075.

Court of Civil Appeals of Texas. Austin.

Dec. 17, 1952.

Rehearing Denied Jan. 21, 1953.

Neilson Rogers, Sherman, by (Joe G. Rollins, Sherman, of counsel), for appellant.

G. H. Penland, Dallas, Freels & Elliott by J. S. Freels, Sherman, for appellee.

GRAY, Justice.

At about 8:30 P. M., December 26, 1950, and at the crossing of Texas Street over appellee's railroad tracks in the City of Denison, Texas, the automobile in which appellant was riding collided with one of appellee's passenger trains. Appellant sustained serious injuries and sued appellee for damages.

Texas Street runs east and west. To the west of appellee's tracks the street is hard surfaced and for a distance before reaching the tracks from the west it declines on a grade from a hill and immediately after crossing the tracks the street goes up a rise. Appellee's tracks run generally north and south, are parallel with and east of the Texas and Pacific Railroad tracks. Texas Street passes over the Texas and Pacific tracks by way of an arched or "humped" wooden bridge thirty-one feet wide and sixty feet long. The Texas and Pacific trains pass through a cut and under this bridge. The traffic along Texas Street passes over this bridge and crosses appellee's tracks which are not covered by a bridge or overpass. It is about nine feet from the west rail of appellee's tracks to the wooden bridge.

On the night in question the weather and streets were dry, there was a strong north wind blowing, it was cold and the night was dark. Appellant was riding in an automobile driven by her son-in-law, George Welch. The front seat of the automobile was occupied by the driver, his wife, sitting in the middle and appellant sitting on the right side. Appellant's two small sons, age six and eight years, were on the back seat. Another son was in Maddona Hospital in Denison. The parties left appellant's home, in Denison, at about eight o'clock P. M., and were going to the hospital to visit the son there. Also appellant expected to remain at the hospital where she worked and was due to go on duty at eleven o'clock P. M.

Appellant alleged that appellee was negligent in various respects and that each act of negligence was a proximate cause of her injuries. Appellee answered and alleged that both appellant and the driver of the automobile were familiar with the crossing in question; alleged that appellant and said driver were negligent in numerous respects; alleged that they violated Art. 6701d, Sec. 86, Vernon's Ann.Civ.Stat., and further that the collision in question was, as to it, an unavoidable accident.

Upon a jury trial, the jury, in answer to special issues, exonerated appellant and the driver of the automobile of negligence, convicted appellee of negligence, and found that the collision was not the result of an unavoidable accident. Among other findings the jury found that the crossing was extraordinarily hazardous; that appellee failed to maintain a signaling device or a flagman at the crossing and that the train was being propelled at a speed in excess of twenty miles per hour (appellant having alleged that appellee violated an ordinance of the City of Denison making it unlawful to operate a railway train within the city limits at a speed greater than twenty miles per hour). The jury further found that the train was being operated at a high and excessive rate of speed under the circumstances; that these and other acts of appellee were each negligence, and each such act was a proximate cause of appellant's injuries. The jury also found that as the train approached the crossing the bell on the engine was rung; that the whistle was blown, and that the "Mars" headlight was burning, and further found that appellant did not fail to keep a proper lookout for the train; that she failed to caution the driver of the automobile to keep a proper lookout, but that such failure was not negligence.

The trial court denied appellant's motion for judgment, and granted appellee's motion for judgment non obstante veredicto.

Just prior to the collision the automobile was approaching the crossing, from the west, at about 20 or 25 miles per hour; the windshield was clear, the headlights were burning and the brakes were in proper condition. There were houses along the south

side of Texas Street, the nearest of which to appellee's tracks was located as being ninety-six feet west from appellee's west rail, twenty-seven feet west from the west side or end of the wooden bridge and thirty-seven feet south from the south curb line of Texas Street.

The driver of the automobile said that he could stop it in twenty-five or thirty feet at the rate he was driving and that the front wheels of the automobile were probably on the wooden bridge when he got his foot on the brakes. He said that up until the time of the collision he had not "become familiar" with the crossing, but on cross examination he said he knew there was a crossing there, and more than once, said that as he approached the crossing he looked to the north and to the south. He said:

"* * * just as I got on the west end of the bridge there was a light that blinded me, and I started to applying my brakes and trying to bring my car to a complete stop just as soon as I possibly could but I got on my brakes and I just didn't see the train in time to stop.

* * * * * *

"Q Where was the train when the light of it blinded you? A Well, approximately about 100 feet—it could have been more or it could have been less—from the crossing.

"Q South of the crossing? A Yes, sir.

"Q Did you apply your brakes? A Yes, sir.

"Q Did your car slow down? A Yes, sir.

"Q Did it stop before it got to the tracks? A No, sir.

* * * * * *

"Q Had the engine passed you by the time you had slowed your car down to 5 miles an hour or less? A Yes, sir.

"Q What part of the train, from your best recollection, did you collide with? A I thought I hit right behind the engine, to the best of my recollection.

* * * * * *

"A No, sir, I am not saying I couldn't see it. (the train)

"Q Could you have seen it before you got on the bridge? A Just a few feet.

"Q That's all you needed, wasn't it? A Yes, sir.

* * * * * *

"Q * * * Now, you knew there was a railroad crossing there. Is that correct? A Yes, sir. I knew there was a crossing there."

Appellant said she did not drive an automobile, had never driven, and that she had no control over the operation of the automobile on the night in question. She said:

"* * * As nearly as I can recall it, the crossing is visible approximately a block west of the crossing. I knew it was there. And I presumed my son-in-law knew it was there. * * *

"Q On this particular occasion, Mrs. Larson—A On this particular occasion I don't remember anything of any conversation. There was nothing at all unusual about the trip, nothing that I can remember and specifically say occurred, until I looked up and saw that we were going to hit a train.

"Q Did you look down the road any as you came down the hill? A Oh, yes.

"Q Was there a train there when you looked? A No, sir.

"Q Do you know where your car was when you saw the train? A I have no idea. Somewhere very near, near enough that I knew that we were going to hit it."

Mrs. George Welch said:

"Q When was the first time you saw the train, Mrs. Welch? A Just a split second before we hit it.

"Q What, if anything, did you observe of it? A All I could see was just the flash of the train, of the silver and red, I believe it was, just before we hit.

* * * * * *

"Q   Both you and your husband knew about that railroad crossing at the bottom of the hill, did you not? A  I knew of it, yes, sir.

"Q   And he knew of it, too, didn't he?  A  I imagine so.

"Q   He had crossed it before with you, hadn't he?  A  I don't.  I imagine he had.

"Q   You knew from your experience, living there by the tracks a few blocks, and passing it going to town, as well as driving over it with your husband, didn't you?  A  Yes, sir, I knew the crossing."

George Welch, the driver, was the first to see the train or its light, and he said he did not see it until he was on the bridge and was blinded by the "Mars" light or the headlight on the engine.  Appellant described the "Mars" light as follows:

"The Mars headlight is a powerful light above the main headlight of a Diesel locomotive, and the reflector of which is mounted on an eccentric and revolves, thus moving the reflected beam in a circular motion ahead of the locomotive."

None of the occupants of the car heard the whistle or the bell.  Appellant and Mrs. Welch knew the crossing was there and though the driver said he was not "familiar" with the crossing he knew it was there.   He is bound to have known the crossing was there because he said, on cross examination, that he did, and also because he said that prior to the time he was blinded by the light he looked to the north and to the south.  He said that at the time the light blinded him he did not know which track the train was on.

There is no suggestion in the evidence that appellee had ever maintained a signaling device or a flagman at the crossing and appellant does not suggest that she relied on one being there as warning to her.

No issue of discovered peril is in the case before us.  In fact there is no evidence that the operators of the train knew of the collision until after the train had reached the station in Denison.

The driver made no effort to stop the automobile until within a short distance of the train and then was unable to avoid the collision.  At the time at least the engine (a two unit diesel, each unit of which was seventy-two feet long) occupied the track, although there was damage to the train cars further back.

Under the facts before us the driver of the automobile is squarely confronted with Art. 6701d, § 8, supra, and would be guilty of contributory negligence as a matter of law.  Zamora v. Thompson, Tex.Civ.App., 250 S.W.2d 626, error ref.; Texas & N. O. R. Co. v. Stewart, Tex.Civ. App., 248 S.W.2d 177, error ref., n. r. e. However, the same rule is not applicable to appellant who was riding in the automobile. The rule applicable to the passenger, as was approved by our Supreme Court in Edmiston v. Texas & N. O. R. Co., 135 Tex. 67, 138 S.W.2d 526, 530, is:

"'Save in exceptional situations, a guest or passenger in a vehicle is not required to keep a constant lookout or to see to it that he shall be in a condition to do so.  Thus, a plaintiff riding in the front seat may take his attention off the road to look at the scenery or may turn around to speak to a friend in the back or he may go to sleep or read a book without being guilty of contributory negligence if the driver commits some negligent act which the plaintiff, had he been on the alert, might have had the opportunity to prevent.  However, if the plaintiff knows that at a particular point there will be a peculiar danger, which he has no reason to believe that the driver if unaided will perceive, the plaintiff may be guilty of negligence if he does not keep himself in a position to call the danger to the attention of the driver. Save under such exceptional circumstances, a plaintiff is entitled to trust the vigilance and skill of his driver unless he knows from past experience or from the manner in which the car is being driven on the particular trip, that the driver is likely to be inattentive or careless.'  'So too, the plain-

tiff is not required to keep his eyes constantly on the speedometer to see whether the driver is exceeding the legal speed limit. He is required to call the attention of the driver to his excessive speed only when the speed is so great that a reasonable man would realize its excessive character.' "

■ Appellant said she knew the railroad crossing was there and "I presumed my son-in-law knew it was there * *." There is no evidence of any exceptional circumstances, or that appellant had any reason to believe that the driver would not perceive the danger existing at the crossing. Certainly there is no evidence that appellant had any reason to believe, or to be apprehensive, that the driver would be inattentive or careless in keeping a lookout for trains. There is an absence of any proof of the existence of any circumstances which would prevent appellant from relying on the driver to keep a lookout for trains approaching the crossing.

On the day after the collision the driver of the automobile went to the scene of the accident and there picked up two parts later identified as a jacking pad cover and a water nozzle cover. These were introduced in evidence and identified as plaintiff's exhibits 29 and 30. There was a dispute in the evidence as to whether or not these exhibits came off of any car in the train and testimony as to the location in the train as to the particular car that they could have come from. There was also testimony as to the amount and place of damage done to the cars in the train.

During the course of the argument to the jury appellant's counsel said:

"I am not going to talk about any evidence but the railroad company's evidence. And you, if you think I am being unfair, you watch me close. You watch me close. When we started out in this lawsuit there was one way to beat it. One way. One way for the railroad company, hold that up, gentlemen, please, sir (Referring to the Jacking pad cover, Plaintiff's Exhibit 29 and the water nozzle cover, Plaintiff's Exhibit No. 30.) One way

for the railroad company to beat the case, there was a plan. Make that car hit far enough back on that train and that lady won't get a red cent. And the witnesses were rounded up and we started the testimony. If, when I had put my case on for this lady, I had offered this—I had it at the time—if we had put this in evidence, the testimony before you would have been different, but it threw, it threw a monkey wrench * * *."

Appellee objected to the argument, the jury was excused and a discussion was had with the trial court and it was decided that the objection included argument made after plats were put on the table which time was selected by the trial court as the beginning point of his instruction to the jury. The jury was brought in and the trial court gave the following instruction:

"Gentlemen of the jury, I instruct you not to consider any part of Mr. Rogers' argument that he has made from the time the plat over there was set up on the table. Forget about that. Do not consider it for any purpose whatever in deliberating on this case."

Appellee requested the trial court to declare a mistrial because of the argument and by its cross point complains that the trial court erred in refusing to do so.

■ Under all of the circumstances and the evidence we do not think that the effect of the argument was such that it could not be cured by the instruction given, and further that the argument was not of such character as was reasonably calculated to cause and probably did cause the rendition of an improper verdict. Further we think that if it can be said that counsel went beyond the record of the evidence it amounted to no more than a comment on appellee's tactics and plan relative to its explanation (in the testimony) as to where the exhibits came from if in fact they came from any cars of the train. We hold reversible error was not presented. 3 B Tex. Jur., Secs. 1046–1047, pp. 677–689.

It is our opinion that the trial court erred in refusing appellant's motion for judgment and erroneously entered judg-

ment non obstante veredicto. It therefore becomes our duty to reverse the judgment of the trial court and to render judgment in harmony with the verdict of the jury. Le Master v. Fort Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224.

The judgment of the trial court is reversed and judgment is here rendered that appellant recover of and from appellee the sum of $8,888.38 with interest thereon at the rate of six per cent per annum from February 22, 1952.

Reversed and rendered.