### GARZA v. GARZA.

No. 11565.

Court of Civil Appeals of Texas. San Antonio.

Dec. 19, 1945.

Kelley & Looney and Ralph T. Rawlins, all of Edinburg, for appellant.

Joe V. Alamia and J. F. Carl, both of Edinburg, for appellee.

MURRAY, Justice.

This is an appeal from a judgment denying appellant, Jose M. Garza, a divorce from his wife, Enriqueta Garcia Garza. The trial was before the court without the aid of a jury, judgment being rendered before appellant had rested upon the theory that his testimony was in the nature of a judicial admission that he was not entitled to a divorce.

Appellant submits but one point, which is as follows:

"The error of the trial court in holding that appellant (plaintiff) judicially admitted that he was not entitled to a divorce on the ground that appellee (defendant) was guilty of such cruelty as to render their living together insupportable and in denying the divorce at such stage of the proceedings."

Appellant plead as ground for a divorce cruel treatment of himself by his wife. Appellant testified that he and Enriqueta were married in Brownsville, Texas, on January 11, 1942. They lived together at Edinburg until October 4, 1942, when he voluntarily entered the armed services of the United States. On November 27, 1942, he landed at the Panama Canal Zone and continued to be stationed there from that date until January, 1945. He had one emergency furlough, in February, 1944, and that was his only furlough, except the one he was on at the time of the trial of this case. He did not have anything to do with his wife, or she with him, when he came home on his emergency furlough, in December, 1944. He is now stationed in California. There is no question as to his legal residence in Edinburg, Hidalgo County, Texas. After his marriage he brought his wife to Edinburg to live and was happy for a period of only two or three weeks, when she grew cold toward him and began to quarrel and fuss with him. He undertook to find out why she had assumed such an attitude toward him, but was unable to do so. This quarreling and fussing kept up until he went into the armed service. Some times she would quarrel with him all night when he was in great need of sleep so that he could do his work. His wife gave birth to a son on January 15, 1943. The baby died May 17, 1943. His wife hated to see him leave when he went into the armed forces and told him goodbye. He wrote her a letter congratulating her when the baby was born. She was living with her mother when the child was born. He had taken her to her mother to live when he left, as he said he wanted her to have good treatment during her trying time of childbirth. As to why he did not separate from his wife before he left, he testified: "One thing is that I was going into the army and was getting away, and I thought maybe she would change later on. Another thing, we had a child. I thought that she would change after the child's birth. Q. You wanted to make a go of it if possible? A. That is

right." While he was away he received three letters. The first was nice, but the last two upset him. He destroyed these letters. An objection was sustained to his stating what was in the letters. He could not sleep after he received these letters, they upset him so much. The Sergeant relieved him from guard duty because he could not sleep. When he went into the army he made an allotment to his wife of $50 per month. One month he wrote for $20 and she sent it to him. Another month he wrote for $30 and she sent that, again he wrote for $40, which she did not send. On February 10, 1943, she wrote him that as soon as she had fully recovered from the effects of childbirth she was going to return to their home in Edinburg, to which he replied that he was very sorry to tell her, but that he had turned the house and furniture over to his friend.

During cross-examination of appellant the following occurred:

"Q. And when you talked to those people that you say you talked to, you had already written this letter? A. Yes, sir.

"Q. Dated February 10th? A. Yes, sir.

"Q. In which you had told her that there was no place for her to go, that you had disposed of the furniture? A. Yes, sir. My father tried to get her to—

"The Court: Do not make any voluntary statement—

"Q. What I am trying to get at, at the time you left for the army, you were not separated from your wife? A. No, sir.

"Q. And you wrote your mother-in-law that you were leaving for the army, and wanted your mother-in-law to have your wife, have her baby born at her house? A. Yes, sir.

"Q. And you did not want her to stay with your father because she was in a family way? A. Yes, sir.

"Q. And after you went into the army you made a voluntary allotment to your wife, did you not? A. Yes, sir.

"Q. And everything was nice? A. Yes, sir.

"Q. And then you started sending home for money—the first time you asked for twenty dollars which she sent you? A. Yes, sir.

"Q. And the second time you asked for thirty dollars and she sent that. And the

third time you asked for forty dollars and she did not send that? A. No, sir.

"Q. I just want to find out when you decided to leave your wife? It was in February, 1943, after the baby was born that you wrote her this letter? A. Yes, sir.

"Q. And that was when you decided? A. That was when I got the first mean letter.

"The Court: I do not think that those letters you say you got from your wife have any bearing on that, but I would like to know just what were in those letters, and would like for you to get that off your chest—I want you to tell me just what were in those letters that you say you got—tell me—A. O. K. In the first letter, she says she was just tired of me; first her child was born and healthy and that was all; that she did not want me any more—

"The Court: She just abandoned you? A. That is right—that is what happened.

"The Court: What was in the other letters? A. She said that she was going to Monterrey, and was going to stay with her mother and did not want to see me any more—

"The Court: Was that the cruel treatment that you mentioned that you could not live with her on account of that? A. Not only that—

"The Court: What else? A. The way she treated me.

"The Court: You stated a while ago you thought you could make a go of it? A. I thought I could.

"The Court: When you got those letters, that was a statement that she was going to abandon you and abandonment can not be cruel treatment—That is not necessarily cruel treatment—she stated in that letter she was not going to live with you any more? A. Yes, sir.

"The Court: That was where she was proposing to leave you—that was why it was impossible for you to live together.

"Mr. Rawlins: When he had letters like that—that was why it was impossible for them to live together.

"The Court: I am inclined to think that it was a judicial admission that he could not live with her after he got those letters, but that is just a statement of abandonment. Up until the time he got these letters, there was not any evidence of in-tention of the defendant to abandon you. There is presumption that this evidence was destroyed, whether it was destroyed to keep it out of evidence or otherwise. The Court is of the opinion that that does not constitute cruel treatment; the courts have held that that does not constitute cruel treatment—I am going to stop this and render judgment denying the divorce.

"Mr. Rawlins: To which ruling of the Court we except—"

■ It is apparent from appellant's own testimony that the cruel treatment which caused him to decide that he could not live with his wife was what was contained in two letters written to him by her after he had gone to Panama. In one letter she told him she "was just tired of him" and "did not want him any more," and in the other letter "She said that she was going to Monterrey, and was going to stay with her mother and did not want to see me any more." In another place in his testimony he stated: "She told me that she was going to Monterrey and have a good time. She told me that she just did not love me any more." It is true they had quarreled and she had grown cold toward him before he left to go to Panama, but he thought they could still live together and make a go of things when he left. After he left to go into the armed forces they had no contact with each other with the exception of the letters which passed between them. As was stated by the trial judge, the most that can be said of the letters is that they were simply notice to him that she did not love him and that she was abandoning him. Abandonment is not such cruel treatment as will justify a divorce, unless it has existed for three or more years. Art. 4629 Vernon's Ann. Civ.Stats.; Coleman v. Coleman, Tex.Civ. App. 22 S.W.2d 764.

■ It is true that he testified that she quarreled and fussed with him before he went into the armed service, but he condoned this conduct and tried to make a go of it. This condoned conduct could not be the basis of a divorce on the ground of cruel treatment unless it was afterwards repeated. Oster v. Oster, Tex.Civ.App., 130 S.W. 265; Murchison v. Murchison, Tex.Civ.App. 171 S.W. 790. He and his wife have never had anything to do with each other personally since he left to go to Panama and, therefore, she could not have repeated this prior conduct.

The trial court was correct in concluding that appellant's testimony, to the effect that the letters received from his wife was the cruel treatment on which he based his suit, was in the nature of a judicial admission that he was not entitled to a divorce. Especially is this true in view of the fact that the court admonished him that the letters at most amounted to nothing more than abandonment, and in view of the further fact that after this his attorney stated in open court, "When he had letters like that—that was why it was impossible for them to live together."

The rule is that where a party testifies to facts in regard to which he has special knowledge, such as his own motives or purposes, or his reasons for acting as he did, he is bound by his testimony; and where the facts to which he testifies, if true, would defeat his recovery, he cannot successfully complain if he is non-suited or if a verdict is directed against him. 20 Am.Jur. p. 1033, Sec. 1181.

If a party, as a witness, unequivocally concedes a fact, such concession has the force of a judicial admission binding the party, unless the court, in its reasonable discretion, allows the concession to be later withdrawn, explained, or modified, if it appears to have been made by improvidence or mistake. Kanopka v. Kanopka, 113 Conn. 30, 154 A. 144; 80 A.L.R. 619. There is no abuse of discretion shown or even contended for here. The rule is ably discussed in Harlow v. Laclair, 82 N.H. 506, 136 A. 128, 131, 50 A.L.R. 973, as follows:

"A search for a general principle deducible from the foregoing cases does not yield satisfactory results. The attempts of some courts to draw an analogy between the statements of parties on the witness stand and judicial admissions contained in pleadings and agreements of counsel (State v. Brooks [99 Mo. 137, 12 S.W. 633]; Stearns v. Chicago, R. I. & P. R. Co. [166 Iowa, 566, 148 N.W. 128]) is not entirely convincing. 4 Wigmore, Ev. § 2594. But in all these cases the courts sense the fact that it would be 'as absurd, as it manifestly would be unjust' (Collins v. [Laconia] Car Co. supra [68 N.H. 196, 38 A. 1047]) to allow a party to recover after he has clearly and unequivocally sworn himself out of court. The statement which comes nearest to enunciating a true general principle seems to be that of the Massachusetts court quoted above that a party may be permitted to contradict his own testimony 'if the circumstances are consistent with honesty and good faith.' Hill v. [West End Street] R. Co. supra [158 Mass. 458, 33 N.E. 582]. Most of the cases which hold that a party is bound by his own testimony may be justified upon the theory that they involve a finding that the circumstances under which the party sought to escape the effect of his own admissions were not 'consistent with honesty and good faith.'

"It appears from these decisions that among the circumstances which should be considered in such a case are the following: (1) Was the party at the time when the occurrence about which he testified took place, and when he testified, in full possession of his mental faculties? (2) Was his intelligence and command of English such that he fully understood the purport of the questions and his answers thereto? (3) What was the nature of the facts to which he testified? Was he simply giving his impressions of an event as a participant or an observer, or was he testifying to facts peculiarly within his own knowledge? (4) Is his testimony contradicted by that of other witnesses? (5) Is the effect of his testimony clear and unequivocal, or are his statements inconsistent and conflicting?

"The answer to the third of these questions will determine whether the fourth is material. If a party's testimony consists only of a narrative of events in which he participated or which he observed, there is an obvious possibility that he may be mistaken like any other witness. In such a situation, if other witnesses give a different version of the occurrence, his testimony must be weighed with theirs, and he will not be concluded by his own statements. But, when a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes, or knowledge, or his reasons for acting as he did, the possibility that he may be honestly mistaken disappears. His testimony must be either true or deliberately false. To allow him to contradict his own testimony under these circumstances would not be 'consistent with honesty and good faith.' Whether his statements be true or false, he will be bound by them, and possible contradictions by other witnesses become im-

material. He will not be allowed to obtain a judgment based on a finding that he has perjured himself.

"The effect of these considerations may be summarized as follows: If a party's mental faculties are undeveloped or impaired, if his comprehension of his testimony is doubtful, if it relates to objective matters about which he may be mistaken, and he is contradicted by other witnesses, or if his statements are inconclusive, the effect of his testimony may be for the jury. But when a man of mature years and unimpaired mentality testifies understandingly and definitely to facts peculiarly within his knowledge, any rational conception of justice demands that he be judged by what he says.

"In the present case, the plaintiff's testimony was of this character. He was a man of mature years. No claim was made that he did not have average intelligence. He testified clearly and unequivocally to a fact peculiarly within his own knowledge, i. e., his inducement for advancing money to the defendant. An examination of the record leads to the conclusion that in all probability the facts stated by him were true. If they are not, he must have deliberately perjured himself. In either event, he is bound by what he said, and any possible discrepancy between his testimony and that of the defendant is immaterial. Reading between the lines of the plaintiff's testimony, it is easy to see that the effect of his admissions as they were made on the witness stand may have been even more conclusive than the mere language of the record would indicate. There was no error in the ruling of the presiding justice."

Appellant cites us to but one case, that of Happ v. Happ, Tex.Civ.App., 160 S.W. 2d 227, 230. In that case Mr. Justice Norvell, speaking for this Court, said:

"The rule applicable to a review of the evidence by an appellate court, in determining appeals from judgments based upon peremptory instructions and motions for judgment non obstante veredicto, is well settled. 'In determining in any case whether or not error has been committed by a trial court in instructing a verdict (or rendering judgment non obstante veredicto), the testimony must be considered in the light most favorable to the losing party. Conflicts in the testimony must be disregarded, and every intendment reasonably deducible from the evidence must be indulged in favor of such party and against the verdict,' or the judgment non obstante veredicto. Anglin v. Cisco Mortgage Loan Company, 135 Tex. 188, 141 S.W.2d 935, 938.

"Viewing the testimony in this light, it can not be said that there is no evidence supporting the jury's answer to special issue No. 14, and the judgment must be reversed unless the rule suggested by appellees has a factual basis in the record.

"The generally accepted statement of the rule is that 'when a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken ·although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony, and cannot successfully complain if he is nonsuited or the court directs a verdict against him.' Annotation, 50 A.L.R. 980.

"This rule, as well as the supporting authorities, are fully discussed in an able opinion by Mr. Justice Grissom of the Eastland Court of Civil Appeals, in Kimmell v. Tipton, 142 S.W.2d 421, 428.

"A party is bound by his admissions made while testifying as a witness, seemingly, upon the theory that such statements are in effect judicial admissions, or at least so similar thereto that they are regarded as conclusive and binding upon the party in the same manner as an admission contained in a pleading or stipulation. See 17 Tex.Jur. 577, § 240.

"Obviously, statements such as were made by Happ in his letter to the Benefit Association of Railway Employees, not being made in connection with any judicial or legal proceeding, are not comprehended by the rule. This letter was admissible in evidence for impeachment purposes, but clearly all self-contradicting statements can not be classified as judicial admissions or given a similar binding effect. McCormick and Ray, Texas Law of Evidence, p. 632, §§ 494, 495.

"We are further of the opinion that the part of appellant's testimony pointed out by appellees is not of the definite and positive nature necessary to establish a binding admission against him. While there is some inconsistency of statement, there is also an insistence upon the existence of an agreement whereby he was to acquire an interest in the property involved. A

conclusive admission, neither modified nor explained, is not disclosed."

In the case at bar appellant testified definitely and positively that what happened was that his wife just abandoned him. Appellant's attorney stated in open court, in reference to the cruel treatment relied upon by appellant: "When he had letters like that—that was why it was impossible for them to live together." No one could know better than appellant what constituted the cruel treatment upon which he based his right to a divorce. This was a matter peculiarly within his own knowledge. There is no contention that appellant did not understand the English language, or that he said something that he did not intend to say, or that while testifying in good faith as he did, yet he was honestly mistaken. Under such circumstances he was bound by his testimony and was thereby precluded from prevailing in the case.

If appellant had sought to change or correct this testimony the trial court in its discretion could have permitted him to do so. There is nothing to indicate an abuse of discretion by the trial court. After the court had admonished appellant that the letters could constitute nothing more than an abandonment, appellant's counsel stated, as above quoted, that "When he had letters like that—that was why it was impossible for them to live together."

The case seems to be rather fully developed if appellant is telling the truth, and we must presume that he is. Appellant and his wife married, then fussed and quarreled, then he entered the armed forces, and nothing further happened between them other than the letters. Appellant testified as follows:

"Q. Has she spoken to you since you left to go to the army? A. Never.

"Q. Has she shown any sort of friendship for or affection for you since you went in the army? A. No, sir.

"Q. When was it that you notified her that you did not want her any more? A. That was when I got one of those letters. She told me that she was going to Monterrey, and have a good time. She told me that she just didn't love me any more."

If she never spoke to him after he left to go to the army she could not have fussed or quarreled with him during the time he was in the army. The fussing and quarreling with him, which occurred before he left was insufficient to constitute cruel treatment rendering their further living together insupportable and even if it were, it had been condoned by his conduct at the time he left to go into the army. It could not constitute any part of the grounds for divorce unless it was renewed or repeated. His testimony makes it clear that such conduct was not repeated. Thus the only thing remaining was the letters. They could not in law constitute cruel treatment such as would justify a decree of divorce.

■ We feel it would have been a better practice for the court to have waited until the plaintiff rested before rendering judgment, but in the absence of a showing of an abuse of discretion it would not be sufficient grounds for a reversal.

The judgment will be affirmed.

NORVELL, Justice (dissenting).

In my opinion the judgment appealed from should be reversed and the cause remanded, for the reason that the trial below never proceeded to that point or stage where the trial judge was authorized to render a final judgment on the merits against plaintiff. Defendant asserted no claim for affirmative relief in her pleadings.

The judgment itself affirmatively discloses the trial court's error in that it recites that "during the testimony of plaintiff in said cause and before plaintiff had rested" final judgment was rendered against plaintiff upon the theory that plaintiff while on the stand had testified to certain facts which if true would have precluded the rendition of a judgment in his favor upon his pleaded grounds for divorce. Plaintiff excepted to the rendition of judgment against him and the case is brought here upon a point which efficiently challenges the correctness of the trial court's action in rendering the judgment which it did render at the particular stage in the trial at which the judgment was rendered.

The above is a sufficient statement of the case to demonstrate that the judgment should be reversed. To my mind it is immaterial that this is a divorce case, or that prior to the precipitate ending of proceedings below, the plaintiff had failed to make out a case or had "sworn himself out of court." Had plaintiff rested his case or refused to proceed with the introduction of his testimony so that it could

be said that that part of the trial allotted to plaintiff to introduce his evidence had passed, I would readily agree with my learned associates that the judgment should be affirmed for the reasons set forth in the opinion.

However, the action of the trial court here deprived plaintiff of his absolute right to take a non-suit prior to the time when in the orderly course of trial procedure he was called upon to decide whether or not he desired to take a non-suit.

In Corpus Juris it is stated that "as a general rule, the court cannot, either on its own motion or that of defendant, dismiss the case before plaintiff has completed the presentation of his proof." 64 C.J. 417, § 410. Here, of course, the trial court went further than to enter a mere dismissal of the cause, but entered a judgment which in any subsequent proceedings would support a plea of res judicata. A judgment of non-suit or dismissal would not have that effect, yet it is stated by Texas Jurisprudence under the title "Divorce and Separation" that: "In accordance with general rules, the defendant in a divorce suit may be entitled to a voluntary nonsuit. And the plaintiff has an absolute and unqualified right to take a nonsuit at any time before the jury retires, when the case is tried before a jury, or before the decision is announced when tried by the judge." See also, Ex parte Norton, 118 Tex. 581, 17 S.W.2d 1041.

Appellee has not cited and we have not found a Texas decision which would support the trial court's action despite the fact that the procedural rules applicable to this situation are taken from statutes which were in existence for a long period of time prior to the transfer of the rule making power to the Supreme Court. The trial court's action appears to be unprecedented.

Rules 164, 262 and 265, Texas Rules of Civil Procedure, read as follows:

"Rule 164. Non-Suit. At any time before the jury has retired, the plaintiff may take a non-suit, but he shall not thereby prejudice the right of an adverse party to be heard on his claim for affirmative relief. When the case is tried by the judge, such non-suit may be taken at any time before the decision is announced.

"Source: R.C.S. art. 2182, unchanged."

"Rule 262. Trial by the Court. The rules governing the trial of causes before a jury shall govern in trials by the court in so far as applicable.

"Source: Art. 2176, unchanged."

"Rule 265. Order of Proceedings on Trial by Jury. The trial of cases before a jury shall proceed in the following order unless the court should, for good cause, to be stated in the record, otherwise direct:

"(a) Plaintiff's petition shall be read to the jury.

"(b) Defendant's answer shall be read to the jury.

"(c) If there be any intervenor his pleadings shall be read.

"(d) The party upon whom rests the burden of proof on the whole case under the pleadings, shall be permitted to state to the jury briefly the nature of his claim or defense and facts relied upon in support thereof.

"(e) Such party shall then introduce his evidence.

\*    \*    \*    \*    \*

"Source: Art. 2180."

Subsequent rules relate to further proceedings contemplated upon the trial of a cause, including the rendition of judgment.

It is my opinion that when a trial has reached that stage where the plaintiff has begun to introduce his evidence, no final judgment on the merits can be rendered against said plaintiff until he has completed the introduction of his evidence or has refused to proceed further with such introduction. The right to non-suit in a non-jury case exists up and until the time the court announces its decision and a trial judge may not deprive plaintiff of this right by precipitatedly rendering judgment before plaintiff has completed the introduction of his evidence. Our rules of procedure clearly contemplate that the stage or phase of the trial set aside for the introduction of plaintiff's evidence shall precede the rendition of judgment.

There are, no doubt, authorities from other Anglo-American jurisdictions which would support, in principle at least, the trial court's action in this case. Good reasons may be advanced to support the desirability of permitting such procedure. I suppose that by this practice the time of the trial court would be conserved and justice would more speedily overtake the unsuccessful litigant and his ill-founded cause. See Oscanyan v. Winchester Repeating Arms Company, 103 U.S. 261, 26

774

L.Ed. 539, relating to the New York Practice of instructing verdict at conclusion of plaintiff's opening statement.

The Texas non-suit practice, now embodied in Rule 164, has been criticized as a time waster, permitting, as it does, the repeated filing of unfounded suits until such filings are restricted by the equity arm. Renfroe v. Johnson, 142 Tex. 251, 177 S.W.2d 600. The rule, however, has not been changed. Corder v. Corder, Tex. Civ.App., 189 S.W.2d 100, writ refused. It may be that litigants and their lawyers prefer the practice which allows them the opportunity of deciding after their evidence is in whether to take a non-suit or rest their case. There are undoubtedly others who hold that the greater good comes from a careful avoidance of the appearance of the denial of a full and fair hearing to a petitioner before a judicial tribunal.

However that may be, I take it that by adopting procedural rules of the same verbiage as that formerly contained in statutes, the Supreme Court did not thereby seek to engraft upon the scheme of Texas practice all of the various procedures in force in sister jurisdictions relating to summary judgments, involuntary non-suits with prejudice, and kindred matters. Until appropriate action is taken by the Supreme Court under the rule making power to provide for a change in procedural processes, the trial of a case must conform to the provisions of the rules as now written. This calls for a reversal of the judgment appealed from.

If it be true, as I believe it is, that the trial court was unauthorized to render the kind of a judgment that was rendered, at the particular time such decision was announced, then it naturally follows that an application of the provisions of Rule 434, Rules of Civil Procedure, will not prevent the error from being a reversible one. The error was in rendering a judgment, and it follows, although somewhat in the nature of an understatement, that such error (the premature rendering of a judgment) "was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case."

It is further my opinion that plaintiff and his attorney were not required to do more than they did do in the trial court to save the point which is urged as reversible error here. Certainly, plaintiff was not required to prepare and have al-lowed some species of a bill of exceptions. The error of the trial court appears upon the face of the judgment and generally the purpose of a bill of exceptions is to show some action taken in the trial court which does not otherwise appear of record.

Since there is no rule or law which authorizes a trial court to render a judgment at the point in the trial and under the circumstances disclosed by this record, it follows that there is no particular rule which prescribes what plaintiff must or may do when confronted by such action. I do not believe that this Court, in order to save the judgment, is authorized to first lay down a rule prescribing what plaintiff should have done and then hold that plaintiff by failing to follow such designated procedure has no right to contend that the error was reversible in nature. To repeat in a repetitious way, the whole point in this case is that the trial court was not authorized to render the judgment it did render at the time it did render such judgment. In my opinion, the judgment should be reversed and the cause remanded.