E. F. BOLLINGER, Appellant,

v.

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY OF TEXAS, Appellee.

No. 3318.

Court of Civil Appeals of Texas.

Waco.

Dec. 1, 1955.

Rehearing Denied Dec. 22, 1955.

Rogers & Rogers, Sherman, for appellant.

Freels, Elliott & Nall, Sherman, G. H. Penland, Dallas, for appellee.

TIREY, Justice.

This is a collision case. Appellant, the driver of a truck, grounded his action upon the negligence of appellee in the operation of its railroad train and in the maintenance of the crossing, and alleged that such negligent conduct proximately caused the collision and damages to him. The court overruled defendant's motion for instructed verdict and the jury in its verdict found substantially: (1, 2 and 3) that the conditions surrounding the railroad crossing were such as to make the same an extraordinarily hazardous crossing at the time appellant attempted to cross the track, and that the failure of the railroad to maintain a flagman at said crossing at the time was negligence, and that such negligence was a proximate cause of the collision; (4 and 5) that the failure of the railroad to maintain signal lights to warn the traveling public of the approach of trains at the crossing at the time was negligence, and that such negligence was a proximate cause of the collision; (6, 7, 8 and 9) that on the occasion in question and immediately before the collision Bollinger and his truck were in a perilous position, and that immediately before the collision in question Hodge actually discovered and realized that Bollinger and the truck were in a perilous position and that Hodge, after discovering the perilous position of Bollinger and the truck, realized that Bollinger could not or would not, in all probability, extricate or remove himself and the truck from such perilous position in time to avoid the collision, but that Hodge did not actually discover the perilous position of Bollinger and the truck within such time and distance that by the exercise of ordinary care and the use of all the means at his command, consistent with safety to himself and the other operators of the train, he could not have avoided the collision; (12, 13 and 14) that the operators of the train failed to sound a timely warning as

they approached the intersection, and that such failure was negligence, and that such negligence was a proximate cause of the collision; (15, 16 and 17) that the operators of the train failed to apply the brakes on said engine and train in time to have avoided the collision with the truck plaintiff was driving, and that such failure was negligence, and that such negligence was a proximate cause of the collision; (18, 19 and 20) that the operators of the train failed to slow the train's speed before entering said intersection, and that such failure was negligence, and that such negligence was a proximate cause of the collision; (21, 22 and 23) that the operators of the train failed to bring said engine to a stop before crossing said highway, and that such failure was negligence, and that such negligence was a proximate cause of the collision; (24 and 25) that the operators of the train failed to keep a proper lookout, and that such failure was a proximate cause of the collision; (26) the jury further found that it was not an unavoidable accident; (27) that Bollinger did not fail to keep a proper lookout for the approach of trains; (29) that Bollinger did not fail to heed the whistle warning of said engine; (32) that Bollinger did not fail to apprize himself of the presence of defendant's engine on the track approaching the crossing; (35) that Bollinger, as he approached the railroad crossing, was not propelling his automobile truck at a speed in excess of 30 miles per hour; (37) that Bollinger did not drive and operate his truck at a speed in excess of that within which he could have brought it to a complete stop within 50 feet and not less than 15 feet from the nearest or north rail of said crossing; (40) that Bollinger was not then and there operating and driving his truck with defective brakes; (43) that the Bollinger truck, at the time and place, while being operated, was equipped with foot brakes, then and there capable, by the use and proper application, of stopping said truck within 45 feet when traveling at a speed of 30 miles per hour on a dry, smooth, level road, free from loose material; (45) that Bollinger did not fail to properly apply his brakes as he approached said crossing; (48) that Bollinger failed to timely apply his brakes as he approached the crossing; (49) but that such failure was not negligence; (51 and 52) that Bollinger failed to timely bring his truck to a stop as he approached said crossing, but found that such failure was not negligence; (54) that the failure of Bollinger to bring his truck to a stop within 50 feet and not less than 15 feet from the nearest or north rail of the crossing was not a proximate cause of the collision; (55) that Bollinger did not fail to keep his truck under proper control at the time; (57) that on the occasion in question and immediately before the collision the train and operators were in a perilous position; (58, 59 and 60) that immediately before the collision Bollinger actually discovered and realized that the train and operators were in a perilous position, and that Bollinger, after discovering the perilous position of the train and operators, realized that the train and operators could not or would not, in all probability, extricate or remove themselves and the train from such perilous position in time to avoid the collision, but that Bollinger did not actually discover the perilous position of the train and operators within such time and distance, that by the exercise of ordinary care and the use of all the means at his command, consistent with safety to himself and to his truck, he could have avoided the collision; (63) that the operators of the train at the time and place were not acting under an emergency; (65 and 66) that $17,000 would reasonably and fairly compensate Bollinger for his injuries; that the reasonable cash market value of the truck immediately before the accident was $1,000 and immediately after $100. The court overruled plaintiff's motion for judgment on the verdict and granted defendant's motion for judgment non obstante veredicto, and decreed that plaintiff take nothing by his suit and that defendant go hence without day with his costs. The plaintiff timely excepted to the judgment of the court and gave notice of appeal and the cause is here on transfer order of our Supreme Court.

The judgment is assailed on two points: (1) the error of the court in overruling plaintiff's motion for judgment because Sec.

86 of Art. 6701d, Vernon's Ann.Civ.Stats., as amended, does not bar plaintiff from recovery; and (2) because the evidence was sufficient to support the jury's verdict.

Appellee's counter points are substantially to the effect that (1) the court did not err in overruling plaintiff's motion for judgment and sustaining defendant's motion for judgment non obstante veredicto, because subsections (c) and (d) of Sec. 86 of Art. 6701d, Vernon's Ann.Civ.Stats., and Sec. 132, subd. 6(b) of said Article, as amended, bar plaintiff from recovery, and (2) that the court did not err in overruling plaintiff's motion for judgment and sustaining defendant's motion for judgment non obstante veredicto, because neither the pleadings nor the evidence nor the jury's findings were sufficient to support a judgment against appellee.

A comprehensive statement is necessary. Testimony was tendered to the effect that this collision occurred when a truck driven by plaintiff struck the side of one of defendant's engines just behind the center at a point where South Union Street in the corporate limits of Whitesboro crosses the tracks of the defendant in the south edge of town. Union Street is a paved street running south from the main street to the city limits. It is 2,112 feet from the center of main street to the point where the railroad crosses it; such street is 36 feet wide from curb to curb; the paved portion being 18 feet wide at the crossing, and for a distance of 85 feet back towards Main Street, the paved portion is 36 feet wide and occupies all of the space between the curbs. As South Union Street runs from Main Street South to the crossing, it is downgrade two-thirds of the way, or approximately 1,400 feet; then the last 700 feet before you reach the crossing is flat. The collision occurred about 5:30 A.M., and at the time of the collision the weather was clear and dry and plaintiff described it as a "perfect morning." The road surface was clear, dry and free of loose material. Plaintiff was enroute from McAlester, Oklahoma, via Whitesboro and Denton, Texas, to Fort Worth; he had traveled this route before and was familiar with the location of the railroad crossing. Plaintiff testified in part:

"Q. Now you knew, Mr. Bollinger, that that railroad crossing was there, where it was located. You expected— A. I expected to cross the railroad down that side of town.

"Q. Yes, sir. You had been over that road before and you were familiar with the location of the crossing? A. I knew it was down in the south end of town, down that street.

"Q. And you knew, did you not, as you approached that railroad crossing that morning, that you might expect to find trains either approaching or using that crossing as you came on it. A. I thought there would be a chance. * * *

"A. I knew there was more than one track, and then I knew there was one on down there.

"Q. And that it was down there on the edge of the populated section of Whitesboro, did you not? A. You mean the first track?

"Q. Yes, sir. A. Yes, sir.

"Q. And you knew to expect traffic on that railroad track as you drove down the highway? A. Yes, sir.

"Q. And you knew a railroad track could and did represent a place of danger? A. That's right.

"Q. And you knew that you should approach a railroad track prepared to stop within 50 and not less than 15 feet from the nearest rail, did you not? A. I did not think of it that way. I always think of it that he should stop if there is any danger.

"Q. And that you should approach a place of danger such as that prepared to come to a stop? A. Yes, sir.

"Q. You did not do that that morning, did you? A. Well, I thought I could stop.

"Q. But you couldn't? A. I didn't stop."

Plaintiff further testified to the effect that he held his foot on the brake all the way down to the crossing from the time he had turned into South Union Street from Main Street, 2,112 feet to the north, in order to keep his speed checked to 30 miles per hour; that he was directly opposite the building known as "Pete's Laundry" when he first heard the train whistle. The south end of Pete's Laundry building was fixed by actual measurement at 94 feet from the north rail of the track and the north end of the building at 124 feet from the north rail. Bollinger further testified that immediately upon hearing the whistle that he increased his brake application as hard as he could; that at this time he could not see the train and that his truck traveled about 35 feet before he saw it; that his first sight of the train was when the nose of the train was about one-half way between the east edge of the pavement and the center line of the pavement; that at the time his truck was near the white house on the east side of the street, which would place Bollinger's truck a minimum of 60 to 70 feet north of the track. Plaintiff's truck was equipped with brakes on all wheels, and the minimum legal brake under Art. 6701d, Sec. 132, subd. 6(b) is required to bring a motor vehicle, under like circumstances, to a stop from 20 miles per hour in 30 feet from the time of brake application and from a speed of 30 miles per hour in a minimum of 45 feet. The train in question was 139 feet in length. Testimony was also tendered to the effect that at no time from the point at which Bollinger first admitted he heard the train's whistle could his view of more than a portion of the train been obscured. The locomotive of defendant stands 14½ feet above the rail and could have been observed by Bollinger at any time from the time his truck reached the north line of the Gulf filling station and grocery, 241 feet from the track. The maximum speed attributed to the train was not over 20 miles per hour. Plaintiff said he could not estimate the speed of the train, but that it was not going fast. Bollinger testified in part:

"Did your brakes take effect when you applied them on your truck? A. I had my brakes on all the way down the hill.

"Q. Well, did your brakes take effect when you applied them on your truck? A. Yes, sir.

"Q. Describe to the jury what happened next? A. After the whistle?

"Q. You heard the two toots and you put on your brakes. Now tell the jury what happened. A. I tried to stop. The train stuck its nose out from behind that building. I saw it crossing the east side of the road and I looked to my right to see if I could turn in ahead of it, and there was a concrete abutment right there by the track and the posts where the railroad had these posts up, and I tried to stop and I couldn't turn because I was afraid it would turn me right against the train. The train was going west and I was going south and that would throw me right in against the train, so I just ran into it.

"Q. What part of the train did you hit? A. I hit the front engine.

"Q. What type of an engine was it? A. Diesel."

All of the witnesses tendered, including Bollinger, either testified directly to the complete absence of skid marks from Bollinger's truck, or that they did not observe any skid marks.

Defendant's Exhibit 11 is a photograph of the intersection of the highway with the railroad. This picture shows a white line in the center dividing the highway into two traffic lanes. Bollinger was traveling south in the west traffic lane, and there is an absence of evidence that he changed his course of direction. Immediately preceding the accident the train was moving in a

westerly direction, and, in so doing, the train necessarily had to cross the east traffic lane before it reached the west traffic lane, and the evidence is also without dispute that the train had reached such distance in the west traffic lane at the time Bollinger's truck struck behind the center of the first unit, straight on from the south-bound traffic lane, and at least 25 feet of this engine had already crossed the west lane of South Union Street. Now, bearing in mind that Bollinger said he heard the whistle before he saw the train, and that he "tried to stop right now when he heard it— it was like a shock to me," and that he said he traveled a minimum of 35 feet after he heard the whistle until he saw the train in the highway, and that he was between 75 and 100 feet back from the crossing when he heard the whistle, such testimony not only brings Bollinger within the provisions of Sec. 86 of Art. 6701d, aforesaid, but

also under the provisions of Sec. 132, par. 6(b) of said Article.

Under the uncontroverted facts in this record, viewed from the light most favorable to the plaintiff, and taken from plaintiff's own testimony and admissions, it is inescapable that plaintiff, after he admittedly received the warning of the engine's whistle, either could have stopped his truck within 50 and not less than 15 feet of the nearest or north rail of the crossing and did not do so; otherwise, he was in violation of Sec. 132, par. 6(b) of the same Article, in that his brakes were insufficient to bring his truck to a stop within 50 feet and not less than 15 feet of the nearest rail from the point of application when traveling at a speed of 30 miles per hour. (Going back to the provisions of par. 6, subsection (b) of Sec. 132 of Art. 6701d, we find that it provides:

"Performance ability of brakes. Every motor vehicle or combination of motor drawn vehicles shall be capable at all times and under all conditions of loading, of being stopped on a dry, smooth, level road free from loose material, upon application of the service (foot) brake, within the distance specified below, or shall be capable of being decelerated at a sustained rate corresponding to these distances:

| | Feet to stop from 20 miles per hour | Deceleration in feet per second per second |
|---|---|---|
| Vehicles or combination of vehicles having brakes on all wheels ............... | 30 | 14" |

It will be recalled that the plaintiff fixed his minimum speed at which he was traveling at the time he heard the whistle at 30 miles per hour). Here alone is ample justification of the action of the trial court in sustaining appellee's motion for judgment non obstante veredicto and entering judgment for the defendant.

Further analyzing and comparing the speed of the train with that of the truck and bearing in mind that the maximum rate of speed of the train under the circumstances being placed at 20 miles per hour and the minimum rate of speed of the truck having been placed at 30 miles per hour, the truck traveled three feet to the train's two feet, and we think the evidence shows that the

train traveled a minimum of 75 feet in full view before it was struck, thereby requiring the truck to travel a minimum of 112.5 feet with the train in full view. Since it is without dispute that the train whistled when it was within 1500 feet of the crossing and was in full view of Bollinger if he had looked to his left, and under his testimony and under all of the undisputed facts and circumstances, we think that Bollinger was guilty of negligence as a matter of law under subsections (c) and (d) of Sec. 86 of Art. 6701d and Sec. 132, par. 6(b) of said Article.

As this court pointed out in Texas & N. O. Ry. Co. v. Stewart, Tex.Civ.App., 248 S. W.2d 177, 184, n. r. e. (a similar situation),

in the construction and application of the foregoing Article, we must bear in mind that it is a criminal statute, because Sec. 143 provides (a) it is a misdemeanor to violate any of the provisions of this Act unless such violation is by this Act or some other law of this state declared to be a felony; and (b) every person convicted of a misdemeanor or a violation of any of the provisions of this Act, for which another penalty is not provided, shall be punished by a fine of not less than $1.00 and more than $200.00. In that case we said: "It seems to us that our legislature, by such enactment, has fixed the standard of duty required of a traveler coming within the above provisions and that such duty is absolute and the failure to observe the same is clearly negligence per se. * * * In so doing, in this particular instance, our legislature has provided an unbending duty on the traveler.'"

Lackey v. Gulf C. & S. F. R. Co., Tex. Civ.App., 225 S.W.2d 630, 632 (no writ history), by the Austin Court, appears to be the first case construing such statute. In that case we find this statement:

"We know as a matter of common knowledge that a railroad engine is not easily hid or obscured, and that had appellant looked he must have seen the engine. 'One may not claim the right to recover, because he has looked and did not see, if the conditions are such that had he looked he must have seen.' (Citing cases.) Our conclusion from the undisputed evidence is that the approaching engine was plainly visible to appellant and was in hazardous proximity to the crossing as appellant approached it, and appellant's failure to stop not less than fifteen feet from the nearest rail of the track being used by the engine and his failure to wait until he could safely proceed was a proximate cause of the collision and its consequences."

We think the factual situation here is stronger in behalf of the Railroad Company than the Lackey case because plaintiff did admit to hearing "two toots" of the whistle, but said in effect that he did not see the train until it stuck its nose out from behind a building located on the east side of the highway on which he was traveling and adjacent to the right-of-way of the railroad. We think the evidence is uncontroverted that if plaintiff had looked in the direction that the train was approaching that he could have seen it before that time. Looking at his testimony alone, he was opposite Pete's Laundry when he first heard the whistle of the train, and by actual measurements on the ground, the south wall of this building is fixed at 94 feet from the north and nearest rail, and the north wall was a distance of 124 feet from the north and nearest rail to plaintiff, so it is inescapable that when Bollinger heard the whistle and his truck was opposite the laundry, he was at a distance from the north or nearest rail of between 94 feet and 124 feet. When he heard the train whistle, his brakes were already on, and he immediately increased his brake application as hard as he could and continued to do so until he hit the train.

A very similar factual situation was before the San Antonio Court in Zamora v. Thompson, Tex.Civ.App., 250 S.W.2d 626, 629, writ ref., and in construing Sec. 86, subsection (d) of Art. 6701d, aforesaid, the court said:

"Even if the train were approaching the highway, the plaintiff did not comply with that provision and it fixes negligence as a matter of law upon the plaintiff." (Citing the Stewart and Lackey cases aforesaid.)

In Texas-Mexican R. Co. v. Bunn, Tex. Civ.App., 264 S.W.2d 518 (n. r. e.), point p. 522, we find this statement by Judge Norvell:

"We first consider the effect of Article 6701d, § 86, which is an imperative enactment of the Legislature enjoining the driver of a motor vehicle to do certain specified things when conditions render the statute applicable. (Citing the Stewart and Thompson cases supra.) The command to the driver of the motor vehicle approach-

ing a railroad grade crossing is to stop the vehicle within 50 feet, but not less than 15 feet, from the nearest rail of the railroad and not to proceed until he can do so safely."

We think the foregoing construction is in accord with the statement of the rule in Texas & P. R. Co. v. Baker, Tex.Com.App., holding approved by the S.Ct., 215 S.W. 556, 557, point 2, where the court said:

"A duty being imposed by statute, a breach thereof, resulting in an injury, of the character which the statute sought to prevent, to one for whose advantage it was enacted, itself constitutes negligence without reference to the degree of care exercised, or of reasonable anticipation of an injury. The performance of the duty does not depend upon, nor is it controlled by, surrounding circumstances. One breaching a statutory duty cannot be heard to say that its breach was consonant with any degree of care. The statute itself charges one that its violation will result in an injury of the character sought to be prevented in its enactment." (Citing cases.)

Our Supreme Court in Mundy v. Pirie-Slaughter Motor Co., 146 Tex. 314, 206 S.W.2d 587, points 3–4, p. 590, gave approval to the foregoing doctrine in these words: "In this state we have followed the rule that the violation of a criminal statute is not merely evidence of negligence, but is negligence per se." (Citing cases.) Our Supreme Court again gave approval to this doctrine in East Texas Motor Freight Lines v. Loftis, Tex.Civ.App., 223 S.W.2d 613, and cited Texas & P. Railway Co. v. Baker, supra. So far as we have been able to determine, our Supreme Court has not departed from the rule nor the application of the rule here stated.

We think the foregoing pronouncements by our Supreme Court are also supported by the rule announced by the Ohio Supreme Court in Swoboda v. Brown, 129 Ohio St. 512, 196 N.E. 274, 278:

"Where a specific requirement is made by statute and an absolute duty thereby imposed, no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care. In such a situation, the obligation and requirement has been fixed and established by law, and the conduct of any person which is violative of such specific statutory requirement is illegal, and, if it proximately results in injury to one to whom a legal duty is owed, the transgressor is liable for the resulting damage."

In the Zamora case, aforesaid, as in this case, the plaintiff testified positively and unequivocally concerning his observations immediately before he heard the whistle and after he saw the train and he did not retract, modify or explain away the statement that he heard the whistle and saw the train, and although he was going at a rate of speed not in excess of 30 miles per hour, he says he used his foot brakes and tried to bring himself to a stop and avoid colliding with the train, and, as we have stated, he had previously applied his foot brakes to his truck coming down the hill and before he heard the whistle and saw the train, and that after he heard the whistle and saw the train, he applied his brakes with all the force he had. Testimony was tendered that no skid marks were observed on the road, and plaintiff says himself that when he saw he couldn't turn to the right, he ran into the train.

This court, in J. R. Watkins Co. v. King, 83 S.W.2d 405, 407 (no writ history), speaking through the late Chief Justice Gallagher, made this statement of the rule which we think is applicable here:

"When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him."

See also Stanolind Oil Co. v. State, 136 Tex. 5, 133 S.W.2d 767, point p. 771, 145 S.W.2d 569; La Fleaur v. Kinard, Tex. Civ.App., 161 S.W.2d 144, er. ref. w. o. m.; Leonard v. Smith, Tex.Civ.App., 186 S.W. 2d 284, no writ history; Garza v. Garza, Tex.Civ.App., 191 S.W.2d 767, no writ history; City of Waco v. Thralls, Tex.Civ. App., 172 S.W.2d 142, w. o. m. See also Texas & N. O. Ry. Co. v. Pool, Tex.Civ. App., 263 S.W.2d 582, point 1, p. 586, and cases there collated, no writ history. See also Bergeron v. City of Pt. Arthur, Tex. Civ.App., 264 S.W.2d 769, point p. 775, n. r. e.

In appellee's brief we find this statement:

"Like the Stewart case, considering the minimum speed attributed to Bollinger's truck and the maximum speed attributed to defendant's train (30 and 20 miles per hour), the car traveling at a speed one-third greater than the train at the time Bollinger turned into South Union Street from Main Street and proceeded towards the track he knew was there, the train was then within 1500 feet of the crossing and proceeding towards it. It is uncontroverted that at any time between the time his truck reached a point 300 or more feet to the north of the track and the point where he first admits hearing the whistle, that had he looked to his left he would have surely seen the approaching train. The train was 139 feet in length; it included two Diesel engines and a caboose. The caboose was 35 feet long and each Diesel was 51.5 feet in length and stood 14.5 feet above the rail. * * * Bollinger admits he struck behind the center of the first unit, straight on from the southbound lane of the highway. At least 25 feet of this engine had, therefore, already crossed the west lane of South Union Street. At the relative speeds of the truck and train, 44 feet per second for the truck, 29.3 for the train, when the truck was 300 feet from the track the train was required to travel 198.24 feet to reach the point of impact and the nose thereof is, therefore,

placed mathematically 155.24 feet east of the east curb line of South Union Street, fully visible in all its bright red and silver paint, across the yard and lot of the witness, Nabors."

We are in accord with these views.

In Blum Milling Co. v. Moore-Seaver Grain Co., Tex.Com.App., 277 S.W. 78, 83 (Com.App., opinion adopted), we find this statement: "Neither a jury, nor an appellate court on a proper review, may rightly ignore physical conditions by which a witness is circumstanced or the maxima potentialities of his vision. * * *"

In Allen v. Texas & P. R. Co., 5 Cir., 195 F.2d 545, point 2, p. 546, we find this statement: "We agree with the court below that the accident could not have happened in the manner described by the plaintiff, because his description was in complete conflict with arithmetical computation and physical possibility."

In San Antonio & A. P. R. Co. v. Biggs, Tex.Civ.App., 283 S.W. 627, point 3, p. 631 (writ dis.), we find this statement: "If the circumstances and uncontroverted physical facts shown are such that the testimony cannot be true upon any reasonable hypothesis, as in this case, a finding of the jury based upon such testimony should be disregarded and set aside."

After a careful examination of all the testimony here tendered, we think that the plaintiff's testimony and all the uncontroverted facts and circumstances surrounding the accident bring this cause clearly within the provisions of subsections (c) and (d) of Sec. 86, Art. 6701d, Vernon's Ann.Civ. Stats., as amended, as well as Sec. 132, par. 6, subsection (b) of said Article aforesaid, and that this record conclusively shows that appellant was guilty of contributory negligence as a matter of law that proximately caused the collision and the resulting damages and injuries to him. It is our view that under the foregoing situation, the trial court should have granted appellee's motion for instructed verdict, and, having failed to do so, it was the court's duty to grant judgment in appellee's behalf on its

motion non obstante veredicto, and the action of the trial court in so doing is affirmed.

Because of the views here expressed, the appellee's counter points become immaterial and pass out of the case and anything we would say about any of them would be dicta.

Accordingly, the judgment of the trial court is affirmed.